1  MARK BRNOVICH
   ATTORNEY GENERAL
2
   Lucy M. Rand (AZ Bar 026919)
3  Assistant Attorney General
   2005 North Central Avenue
4  Phoenix, Arizona 85004-1592
   Phone: (602) 542-1645
5  Fax:     (602) 542-7670
   E-mail: Lucy.Rand@azag.gov
6
   *Attorneys for State of Arizona*
7      *Defendant Keith Smith*

8          **UNITED STATES DISTRICT COURT**

9              **DISTRICT OF ARIZONA**

10

11  Miguel Angel Garfias-Ortega,              No. CV17-01091-PHX-JJT (BSB)

12              Plaintiff,                  **DEFENDANT SMITH'S**
                                           **RENEWED MOTION FOR**
13  v.                                     **SUMMARY JUDGMENT**

14  Charles L. Ryan, *et al.*,

15              Defendants.

16          State of Arizona Defendant Keith Smith,[1] through undersigned counsel, pursuant

17  to the Federal Rules of Civil Procedure 56 and Local Rule 56.1 and the Court's Order

18  (Doc. 159), moves for renewed summary judgment.

19          Miguel Angel Garfias-Ortega ("Plaintiff"), a former Arizona Department of

20  Corrections ("ADC") inmate, made a number of requests for protective custody ("PC")

21  status over the course of approximately four years, each of which were investigated by

22  the ADC and appropriate action short of PC placement was taken in each instance.

23  Nevertheless, Plaintiff claims injuries that he received from an assault by other inmates

24  were the result of his requests for PC status being denied.  Defendant Keith Smith acted

25  reasonably and there was no deliberate indifference to a substantial risk of harm to

26

27  [1]   State of Arizona Defendant Charles Ryan's defense was tendered to Corizon Health,
          Inc. and Defendant Ryan answered on November 6, 2017.  (Doc. 27.)
28

#7897604v2

Plaintiff.   Defendant Smith requests that all claims against him be dismissed.   This Motion is supported by the following Memorandum of Points and Authorities and Defendants' contemporaneously filed separate Statement of Facts in Support of Renewed Motion for Summary Judgment (each fully incorporated herein by this reference.)

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Introduction

Plaintiff claims in Count One of his Second Amended Complaint[2] (Doc. 26) that Defendant Keith Smith, ADC Security Operations Administrator, was deliberately indifferent to a threat to his safety in violation of the prohibition against cruel and unusual punishment under the Eighth Amendment.   Plaintiff claims that between 2012 and 2014 Defendant refused to grant him Protective Custody[3] ("PC") status when he advised ADC staff that he was being targeted for assault by a particular prison gang and, instead, each time was transferred to general population housing.   Plaintiff claims that although his concerns were investigated, he was only moved to another prison facility and that the move was insufficient to protect him from subsequent alleged assaults. Plaintiff seeks compensatory damages, lost future wages, future medical expenses, and punitive damages.

### II.    Factual Summary

At the times relevant to this lawsuit, Plaintiff Miguel Angel Garfias-Ortega ("Garfias-Ortega"), Arizona Department of Corrections ("ADC") #230786, was an

---

[2]   On November 2, 2017, the Court screened the Second Amended Complaint.  (Doc. 24.)   The Court stated that the operative claim against the State Defendant Keith Smith is Count One.   (*Id.*)   The Court granted summary judgment in favor of State Defendant Charles Ryan and dismissed Defendant Ryan.  (Doc. 159 at 41.)

[3]   Effective March 7, 2013, the ADC changed its protection policy title from "Protective Segregation" ("PS") to Protective Custody ("PC").   One or both terms or abbreviations may be used interchangeably in ADC documents and herein regardless of the time period.

1    inmate serving a term of incarceration in the custody of the ADC.  (Defendant's Separate

2    Statement of Facts ("DSOF") at ¶ 1, hereinafter "DSOF at _".)

3          Defendant Smith was employed by the ADC as the Security Operations

4    Administrator and was located at the ADC's Central Office.  (DSOF at 61.)  Defendant

5    Smith's responsibilities included, among others, reviewing inmate appeals of decisions

6    made by the PC Committee denying inmates' requests for PC status.  (*Id.*)

7          Prior to Smith's tenure at the ADC, Smith worked for the Ohio State corrections

8    system from 1987 through November of 2011.  (Declaration of Keith Smith at ¶ 5 (Jun.

9    25, 2019), hereinafter "Smith Decl. at _".)  Among his positions, from 2000 through

10   2008 Smith was the Major and Chief of Security at the Toledo Correctional Institute

11   located in Toledo, Ohio, which included close custody and protective custody inmate

12   housing units.  (*Id.*)  From 2008 through 2010, Smith was the Warden of the Mansfield

13   Correctional Institute, located in Mansfield, Ohio, which included close and maximum

14   custodian inmates and death row.  (*Id.*)  Smith returned to the Toledo Correctional

15   Institute in 2010 and was the Warden until he left to work at the ADC in November of

16   2011.  (*Id.*)

17         During the relevant time period, Defendant Smith's office received approximately

18   10+ PC appeals per week; consequently, the vast majority of Smith's time was devoted

19   to the review and preparation of responses to the same.  (DSOF at 63.)

20   **A.     ADC Protective Custody Process**

21         If an inmate within the ADC needs protection from other inmates, either generally

22   or from specific inmate(s), the ADC has a process that addresses an inmate's need for

23   protection.  (DSOF at 36.)  Department Order ("DO") #805, Protective Custody, governs

24   the ADC protection process and establishes procedures for identifying and safeguarding

25   inmates with legitimate protection needs.  (*Id.*)  While careful classification, appropriate

26   security measures, and preliminary screening for alternate management strategies can

27

28

1    serve to reduce the number of such cases, some inmates still require segregation from the

2    general prison population.  (DSOF at 37.)

3           Each inmate's request for PC status and attendant circumstances is individualized

4    and one solution is not appropriate for all; therefore, each request for PC status is

5    investigated and carefully reviewed to determine the best option(s) available for the

6    inmate and if alternative option(s) to granting PC status can resolve an inmate's safety

7    issue(s), these are sought first.  (DSOF at 38.)  An inmate in need of protection has

8    several options.  (DSOF at 39-42.)

9           When an inmate's safety issues are related to a particular inmate or inmates, but is

10   otherwise able to safely live among other inmates, the inmate may be able to be

11   transferred to a different bed assignment, cell block, unit, or complex in another GP

12   location, in accordance with the Classification Technical Manual limitations.[4]  (DSOF at

13   39.)  In addition, inmates that are identified as posing a legitimate threat to the safety of

14   the inmate are placed on the inmate's do not house with ("DNHW") list in the inmate's

15   Adult Inmate Management System ("AIMS") automated file.

16          When approving an inmate for PC status is appropriate, the inmate is placed in PC

17   housing, where the inmate will be housed only with other PC inmates.  (DSOF at 41.)  In

18   addition, inmates that are identified as posing a legitimate threat to the safety of the

19   inmate are placed on the inmate's DNHW list in the inmate's AIMS automated file.

20   (DSOF at 42.)

21          An inmate's written or verbal request for protection triggers a documented review

22   of the inmate's need for protection.  (DSOF at 43)  Next is the completion of the

23   Protective Custody Inmate Statement, to identify specific information related to the

24   inmate's PC request (DSOF at 43), followed by a discussion with the Shift Commander,

25   who attempts to resolve the inmate's safety concerns (DSOF at 44).  If the inmate's

26
27   [4]    DNHW inmates may be assigned to the same housing area where the inmates can be separated by a physical barrier and managed separately or where controlled movement exists and the inmates do not have access to each other.
28

concerns can be informally resolved, the PC process ends and does not involve or reach the level of the PC Committee.  (DSOF at 45.)  If the inmate's concerns cannot be informally resolved and it is determined that the inmate requires a PC review, the Initial Protective Custody Review Process begins (DSOF at 46) and an initial interview is conducted with the inmate (DSOF at 47).

If the Deputy Warden determines that a PC review is required or the inmate is not willing to agree that movement to another GP yard would resolve the issue, the DW documents the reasons and forwards the documents to the CO IV the same day.  (DSOF at 48.)  Upon the inmate's request to return to GP, if the DW agrees the inmate can be returned.  (DSOF at 50.)  Once the DW determines that a protection issue exists using numerous criteria, he recommends either PC, alternative placement to another unit, or denial.  (DSOF at 51.)  The DW forwards his/her recommendation to the Central Office Protective Custody Unit for review to ensure the documentation is complete, review case information and complete the Protective Custody Decision Worksheet.  (DSOF at 52.) The Central Office PC Unit forwards it to the Protective Custody Administrator ("PC Administrator") for his/her review and recommendation, who forwards it to the PC Committee for consideration by the Committee.  (DSOF at 52.)

The PC Committee reviews the documentation and makes a final decision on the inmate's request for PC status.  (DSOF at 53.)  If the Committee's decision is different than that reached by the DW, a written rationale must be provided.  (DSOF at 53.)  The DW or designee ensures that the inmate is advised of the PC Committee's decision. (DSOF at 54.)  If the PC Committee grants an inmate PC status, the inmate does not appeal, the inmate's PC review process ends, and the inmate's PC review process does not involve the Security Operations Administrator.  (DSOF at 55.)

If the PC Committee denies an inmate's request for PC status, the inmate may appeal the PC Committee's denial of the inmate's request for PC status.  (DSOF at 56.) The DW or designee at the inmate's unit notifies the inmate of the PC Committee's

decision and his appeal rights, and ensures that the inmate signs, dates and acknowledges being advised of the right to appeal to the decision using the Protective Custody Placement Review Request form.  (DSOF at 57.)  If the inmate chooses not to appeal the PC Committee's decision, the inmate's request for PC ends and does not involve the Security Operations Administrator or designee.  (DSOF at 57.)  If the inmate chooses to appeal the PC Committee's decision, the DW or designee ensures that the inmate is provided an Inmate Letter form to appeal.  (DSOF at 57.)

The inmate has the option to appeal the decision of the PC Committee to the Security Operations Administrator, who reviews the appeal and ensures a response is formulated.  (DSOF at 58.)  The Security Operations Administrator's decision is final and may not be appealed.  (DSOF at 60.)

## III.    Legal Analysis

### A.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317*,* 323 (1986).  If the movant meets its initial responsibility, the burden then shifts to the non-movant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986).  Mere allegation or speculation cannot create a genuine dispute.  *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

**B.      Garfias-Ortega's Failure to Timely File Suit Bars His Action.**

Title 42 U.S.C. § 1983 does not include its own statute of limitations. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). Therefore, federal courts apply the statute of limitations governing personal injury claims in the forum state, "along with the forum state's law regarding tolling, including equitable tolling, except to the extent any of these laws is inconsistent with federal law." *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1198 (9th Cir. 2014) (citation omitted). [*Douglas v. Noelle*, 567 F.3d at 1109 (citations omitted).] In Arizona, the limitations period for personal injury claims is two years. *TwoRivers*, 174 F.3d at 991; *see also* Ariz. Rev. Stat. § 12-542 (providing that actions for personal injury must be commenced within two years after the cause of action accrues). Although the statute of limitations applicable to § 1983 claims is borrowed from state law, federal law continues to govern when a § 1983 claim accrues. *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *TwoRivers*, 174 F.3d at 991. Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *TwoRivers*, 174 F.3d at 991; *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996); *Soto v. Sweetman*, 882 F.3d 865, 870 (9th Cir. 2018) (citation and internal quotation marks omitted.) Here, Plaintiff was placed in General Population on or about December 4, 2014, where he was assaulted by other inmates. (Doc. 26 at ¶ 4.) Consequently, Plaintiff's threat-to-safety claim against Defendant Smith accrued on December 4, 2014.

However, during mandatory exhaustion of administrative remedies, the limitation period is tolled. *See Arizona Dep' t of Revenue v. Dougherty*, 29 P.3d 862 (Ariz. 2001); *Third & Catalina Assoc. v. City of Phoenix*, 895 P.2d 115, 119 (Ariz. Ct. App. 1994); *see also* Ariz. Rev. Stat. § 12-821.01(c) (cause of action required by law or contract to be submitted to administrative review process does not accrue until process exhausted.). Here, to address an issue of inmate-on-inmate assault, Plaintiff could use the Inmate Grievance Procedure governed by DO 802 and/or the Protective Custody procedure

1   governed by DO 805.  On December 6, 2014, Plaintiff requested PC status through the

2   PC process under DO 805.  (DSOF at 107.)  Plaintiff did not submit any grievances at

3   any level regarding his assault.  (DSOF at 20-21, 26, 28-29, 33.)  Consequently, Plaintiff

4   had notice of the assault when it occurred on December 4, 2014.  On December 6, 2014,

5   Plaintiff returned from the hospital, completed a Protective Custody Inmate Statement,

6   and was interviewed regarding his request for PS status.  Consequently, Plaintiff could

7   have submitted a grievance regarding a failure to protect as of December 6, 2014, when

8   he returned to the prison complex.  Pursuant to the Inmate Grievance Procedure, the

9   inmate has ten workdays from the date of the cause of action or from the date he is able

10  to submit a grievance.  (DSOF at 10.)  In this case, Plaintiff was at the hospital and did

11  not have access to grievance forms until he returned to the complex on December 6,

12  2014.  Plaintiff could have submitted a grievance within ten workdays of December 6,

13  2014, but failed to do so.  Here, Plaintiff did not attempt to submit any grievances

14  regarding his failure-to-protect claim at any level.  (DSOF at 20-21, 26, 28-29, 33.)

15  Plaintiff did, however, submit a request for PC status on December 6, 2014 and his

16  request was granted on February 24, 2015.  (DSOF at 107.)  Plaintiff did not submit any

17  formal grievances regarding his failure-to-protect claim.  (DSOF at 20-21, 26, 28-29,

18  33.)  Here, Plaintiff filed his lawsuit on April 11, 2017, which was more than three

19  months past the two-year statute of limitation.  Consequently, Plaintiff's action is barred

20  by the applicable statute of limitations because Plaintiff filed this lawsuit after two-year

21  statute of limitations, as equitably tolled by the PC process.

22       **B.    Eighth Amendment**

23       "To prevail in a civil action against state actors for the deprivation of 'rights,

24  privileges, or immunities secured by the Constitution and laws,' 42 U.S.C. § 1983, a

25  plaintiff must show that '(1) acts by the defendants (2) under color of state law

26  (3) depriv[ed][him] of federal rights, privileges or immunities [and] (4) caus[ed][him]

27  damage.'"  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005)

28

1   (citation omitted).  Even where a plaintiff claims injury, to state a valid § 1983 claim, he

2   must allege that he suffered a specific injury as a result of the conduct of a particular

3   defendant, and must allege an affirmative link between the injury and the conduct of the

4   defendant.  *Rizzo v. Goode*, 423 U.S. 362, 371-372, 377 (1976).  A complaint must

5   allege specific facts upon which a plaintiff relies in claiming the liability of each

6   defendant.  *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).  A plaintiff must

7   demonstrate that each defendant personally participated in the deprivation of his or her

8   rights.  *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).  Garfias-Ortega fails to

9   allege facts to establish that the conduct of Defendant Smith, as the Administrator of

10  Security Operations, caused his alleged injuries.

11          "The Eighth Amendment requires prison officials to take reasonable measures to

12  guarantee the safety of inmates, which . . .   include[s] a duty to protect prisoners."

13  *Labatad v. Corrections Corp. of America*, 714 F.3d 1155, 1160 (9th Cir. 2013) (citation

14  omitted).  To state a claim under the Eighth Amendment, a prisoner "must show that the

15  officials acted with deliberate indifference to the threat of serious harm or injury" to him.

16  *Id.* (citation omitted).  "'Deliberate indifference'" has both subjective and objective

17  components.  A prison official must 'be aware of facts from which the inference could be

18  drawn that a substantial risk of serious harm exists, and ... must also draw the

19  inference.'" *Id.*, citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).  Even if an official

20  is aware of a sufficient risk, he cannot be liable if he acts reasonably to avert it—even if

21  the harm is not ultimately averted.  *Farmer,* 511 U.S. at 844-45.

22          "[A] case involving an individual prisoner's safety from attacks by other prisoners

23  may implicate 'competing institutional concerns for the safety of prison staff or other

24  inmates.'. . .   Removing a prisoner from a hostile or vengeful inmate may protect the

25  prisoner, but the move may endanger others."  *Berg v. Kincheloe*, 794 F.2d 457, 461 (9th

26  Cir. 1986) (citation omitted).  Hence, courts should afford "wide-ranging deference . . .

27  to a prison security measure."  *Whitley v. Albers,* 475 U.S. 312, 321-22 (1986).

28

1

2

          **a.**    **Defendant Smith Responded Reasonably to Plaintiff's April 3, 2013 Request for PC Status at Yuma-Dakota**

3

       Defendant Smith reviewed all of the documentation regarding Plaintiff's request

4

for PC status made on or about April 3, 2013, and responded appropriately to the

5

evidence.

6

       Defendant Smith denied Plaintiff's request for PC status because Plaintiff's

7

claims of being physically assaulted were inconsistent and not corroborated by the

8

physical evidence.  (DSOF at 85.)  Smith reviewed an IR written by CO II Cordova

9

which stated that CO II Cordova "conducted a body check on inmate and he doesn't

10

have any signs of him being assaulted."  (DSOF at 76.)  Smith also reviewed the PC

11

Committee's decision worksheet, which noted that the Garfias-Ortega claimed "he had

12

been assaulted by two inmates", but when Garfias-Ortega had been evaluated by SSU

13

and medical staff, "he did not have any indications on his body that he had been in a

14

physical altercation."  (DSOF at 79.)  Smith reviewed the Deputy Warden's PC review

15

form, which stated, "claims assaulted, taken to medical for evaluation, Sgt. conducted

16

body check, no visible marks."  (DSOF at 82.)

17

       Smith also states that Plaintiff's claims from his prior requests for PC status were

18

inconsistent.  On one occasion Garfias-Ortega claimed that he unknowingly fought a

19

high-ranking member of the Border Brothers and is now targeted by the Border Brothers.

20

(DSOF at 85.)  On another occasion Garfias-Ortega claimed he was asked to perform

21

work for the Border Brothers, refused to do so, and is now targeted by the Border

22

Brothers.  (DSOF at 85.)  Smith reviewed Plaintiff's PC appeal, which in pertinent part

23

Garfias-Ortega claimed that in the past he was hospitalized due to "severe head trauma"

24

and SSU personally saw his "stab wounds on [his] back."  (DSOF at 73.)  There is no

25

evidence, however, that Garfias-Ortega suffered any wounds of this type.  (DSOF at 93,

26

95.)  Smith also reviewed Plaintiff's current request for PC status, which in pertinent

27

part, Garfias-Ortega claims he was "compelled to leave the yard by the Border Brothers

28

since 2009."  (DSOF at 75.)  Smith also reviewed a PC interview report written by Sgt.

1  Vargas that stated Garfias-Ortega claims that at Cimarron he was cut several times on the

2  back by a supposed Border Brother head."  (DSOF at 77.)

3          Defendant Smith reviewed the evidence and did not find that Garfias-Ortega was

4  in danger or had a need for PC status that could not be resolved by moving the Garfias-

5  Ortega away from the allegedly threatening inmates and by additions to Garfias-Ortega's

6  DNHWs list.  Smith did not see a threat to Plaintiff's safety and then consciously

7  disregard that threat.  Consequently, Defendant Smith was not deliberately indifferent to

8  a threat to Plaintiff's safety.

9                    **b.    Defendant Smith Responded Reasonably to Plaintiff's October
                              30, 2012 Request for PC Status at Tucson-Cimarron**
10

11          On October 30, 2012, Garfias-Ortega claimed that on October 26, 2012, he had

12  been involved in a fight with an inmate that turned out to be a "somebody", a high-

13  ranking member of the Border Brothers.  Garfias-Ortega claimed that he was assaulted

14  by three inmates and sustained cracked ribs, a broken nose, facial injuries, and was

15  stabbed in the back.  (DSOF at 91.)  Smith reviewed reports that stated medical had

16  evaluated Garfias-Ortega for minor injuries, including scratches on his face and back and

17  bruises consistent with a fight or minor assault; however, there were no reports that

18  Garfias-Ortega was treated for cracked ribs, a broken nose, or stab wounds.  (DSOF at

19  93.)  Further, investigators took photographs of Garfias-Ortega's back and facial area

20  "due to old scratches observed."  (DSOF at 93.)  The photographs did not show that

21  Garfias-Ortega had suffered a broken nose or that there were stab wounds on his back.

22  Further, the absence of photographs of his rib area by investigators indicates that

23  Garfias-Ortega had not suffered any injury to this part of his body.  (DSOF at 95.)

24          At the time of the October 30, 2012, request, Garfias-Ortega's only prior PC

25  request, which occurred in 2008, the investigation determined that Garfias-Ortega

26  wanted to be housed with Mexican Nationals.

27

28

1  Defendant Smith reviewed the evidence and did not find that Garfias-Ortega was
2  in danger or had a need for PC status that could not be resolved by moving the Garfias-
3  Ortega away from the allegedly threatening inmates and by additions to Garfias-Ortega's
4  DNHWs list.   Smith did not see a threat to Plaintiff's safety and then consciously
5  disregard that threat.   Consequently, Defendant Smith was not deliberately indifferent to
6  a threat to Plaintiff's safety.

7          c.    **Defendant Smith's Denial of PC Status Did Not Affect his**
8                  **Request for PC on September 24, 2014**

9  On September 24, 2014, Garfias-Ortega requested PC status.   According to the
10  Unit Administrator PC Review form, Garfias-Ortega stated that he had not been
11  threatened and he had no new issues.   (DSOF at 104-105.)   Further, Garfias-Ortega
12  agreed to be housed at a different location to resolve the issue.   (*Id*.)   Garfias-Ortega did
13  not appeal the move to another housing location.   (*Id.*)   Consequently, Garfias-Ortega's
14  request for PC status ended.   (*Id.*)

15  **IV.**    **CONCLCUSION**

16  Defendant requests this lawsuit be dismissed as it is barred by the applicable
17  statute of limitations for actions brought pursuant to 42 U.S.C. § 1983.   Additionally,
18  Defendant requests this lawsuit be dismissed because Garfias-Ortega fails to state a
19  claim against Defendant upon relief can be granted, and cannot show that there is a
20  genuine dispute of material fact.   Therefore Defendant is entitled to summary judgment
21  as a matter of law.

22  Respectfully submitted this 25th day of June, 2019.

23                        MARK BRNOVICH
                      ATTORNEY GENERAL
24
25                        s/ Lucy M. Rand
                      Lucy M. Rand
26                        Assistant Attorney General
                      *Attorneys for State of Arizona*
27                          *Defendant Keith Smith*

28

#7897604v2                          12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2019, I electronically transmitted the attached document to the Clerk of the Court using the ECF System.  This document and the Notice of Electronic Filing were electronically served on each attorney of record. Additionally, this document and the Notice of Electronic Filing were served by mail on June 26, 2019, on the following, who is not a registered participant of the CM/ECF System:

Miguel Angel Garfias-Ortega
418 N. 18th Ave.
Phoenix, AZ  85007
*Plaintiff Pro Se*

s/ M. Beke
Legal Secretary

#7897604v2                                   13